HAMITER, Justice
 

 (dissenting).
 

 I agree with the observation in -the majority opinion that “* * * adoption is a creature of statute; that, this being so, it is only what the law makes it and that, to establish the relation, the statutory requirements must be strictly carried out, otherwise, the adoption is an absolute nullity.” But, contrary to the holding of the majority herein, I maintain that under the Louisiana adoption statute if natural parents have formally and freely consented to the adoption of their child, and the proposed adoptive parents have acted thereon by bringing adoption proceedings, the former cannot arbitrarily withdraw that consent (merely because of a change of mind) so as to prevent the entering of a final adoption decree, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time and bonds of affection have been forged between them and the child. I do not subscribe to the conclusion, in other words, that the consent of the natural: parents must be of a continuing nature and that thé withdrawal of it prior to the rertdi
 
 *177
 
 tion of a final decree is just as effective a bar to the adoption as though the consent had never been given.
 

 The view that I entertain springs from our present statute, Act No. 154 of 1942, considered in the light of the history of its development. Under Act No. 31 of 1872, as amended by Act No. 48 of 1924, adoption was accomplished by a mere notarial act signed by the natural and the adoptive parents; no other procedure was required. Surely under that legislation the natural parents could not withdraw their consent, if voluntarily and freely given, following their execution of the required authentic act of adoption.
 

 In the subsequent statutes provision was also made for the formal surrendering of the child by the natural parents to the adoptive parents, by a notarial act under Act No. 46 of 1932 and by a legal act of surrender under Act No. 428 of 1938 and Act No. 154 of 1942. But all provided further for the petitioning of a court of competent jurisdiction, with proceedings had in that tribunal, in order to consummate the adoption.
 

 Under none of our statutes have persons been required or compelled to consent (against their will) for the adoption of their child; but under all of them, in my opinion, when and if they voluntarily gave their formal consent (by a notarial act or the legal act of surrender referred to in the respective statutes) they, by that actj effectively relinquished their parental rights to the child and could not thereafter be heard except as ordinary citizens speaking in the interest of the child’s welfare. If this were not true they would be necessary parties to the subsequently conducted judicial proceedings; but they are not, for under the present statute, as well as those superceded by it, .the serving of a petition and citation on them is not required. Thus in Section 3 of Act No. 154 of 1942 it is said: “A copy of said petition so filed shall be served on the State Department of Public Welfare, through the State Director of Public Welfare by registered mail and, on each of the living parents of the child to be adopted in the manner prescribed by law for service in civil proceedings,
 
 unless the child hats been properly surrendered
 
 or has been declared legally abandoned by a Court of competent jurisdiction. * * * ” (Italics, ours.)
 

 Moreover, if the continuing consent of the natural parents be necessary, as is held in the majority opinion, it seems to me that they, as parties in interest, should at least be ruled into court to show cause why the final adoption decree should not be entered; but the statute does not contain that requirement.
 

 The period that must elapse between the interlocutory and final decrees, provided for in both the 1938 and 1942 statutes, obviously was not intended to afford time to the natural parents for reconsidering their free and voluntary act of surrender
 
 *178
 
 ing the child for adoption. It constitutes nothing more than a probationary period respecting the adoptive parents and the child, during which the State Welfare Department, acting in behalf of the State and in the interest of the child’s welfare, investigates and considers the fitness — -moral, economic and otherwise — of the adoptive parents and also the reaction of the particular child to them.
 

 If for good cause, meaning of course the unfitness of the adoptive parents for the child or the unsuitability of the proposed adoption arrangement (but for no other reason), the court may revoke during that period its previously entered interlocutory decree. This authority is provided in Section 5 of our present statute, reading as follows: “At any time before the entry of such final decree of adoption the Court for good cause may revoke its interlocutory decree awarding the temporary custody either on its own motion, or on the motion of the State Department of Public Welfare, or its duly authorized agent, or on the motion of any person or persons interested in said child, but no such revocation shall be entered unless ten days’ notice in writing shall have been given to petitioner and the State Department of Public Welfare or its duly authorized agent, or unless petitioners and the State Department of Public Welfare or its agents, have an opportunity to be heard.”
 

 It is to be noticed that the similar section of the 1938 statute used the words “* * * or on the motion of the parent or parents * * * The changing of this clause to read (as in the present statute) “ * * * or on the motion of any person or persons interested in said child * * * ” was done, I think, for the express purpose of avoiding the result that has been reached by the majority in this case. Under the 1938 statute there might have been justification for the majority’s holding in as much as the parent or parents were specifically authorized to file the motion. But in view of the change, it seems clear that now the natural parents who have given their consent are in no better position to defeat the adoption than any other person interested in the child’s
 
 welfare;
 
 they can prevent it only by showing good cause, in which category the mere changing of the mind does not belong.
 

 The majority opinion calls attention to another change in the former law, it being that Section 7 of Act No. 154 of 1942 provides that the findings of the report of the Department of Public Welfare, made for the court’s benefit, shall among other things be based “ * * * on the availability of said child for adoption”. This provision, I think, refers not to such a case as this (where the parent has executed the formal act of surrender) but, rather, to those cases envisioned in Section 3 where “the child has not been legally abandoned, or properly surrendered” and the State Department of Public Welfare is directed to “make very effort to locate the
 
 *179
 
 responsible living parent or parents of the child to be adopted, to inform said persons of the proposed adoption to determine their attitude toward the proposed adoption”.
 

 The history of the development of our present adoption law, beginning with the earliest statute, is convincing that the Legislature has never intended to require anything more or less of the natural parents in relinquishing their rights to the child than the formal act of surrender, or to authorize them to withdraw' their consent once it has been given voluntarily and pursuant to the legal requisites. The numerous changes made during the development period purposed only to increase the burden on the adoptive parents, by requiring them to prove that they are fit and suitable persons, in keeping with the general trend of society of looking to the best interest of the child proposed to be adopted. Nothing can be found in any of the statutes granting authority for the natural parents to revoke an interlocutory decree; rather, the later ones specifically provide for the court’s revoking it
 
 for good cause.
 
 And to hold that such parents have that authority, as the majority opinion does, is to read into the statute such a provision, to judicially legislate.
 

 The reason why the Legislature never intended that the natural parents, after consenting freely and formally, could defeat the adoption by merely changing their •minds is revealed by the very facts of this case. Following the death of the mother of the child in question and prior to the commencement of the adoption proceedings, Mr. and Mrs. Green had the child’s custody, pursuant to the father’s’ consent, for a number of months. On March 7, 1945, they filed a petition for the adoption, annexing thereto the written consent (a notarial act of surrender) of the natural father. On May 28, 1945, after considering the report of the State Department of Public Welfare and the formal surrender by the natural father, the court entered the interlocutory decree. It was not until February 28, 1946, or almost a year after the adoption consent was given and the petition filed, that the natural father proceeded by motion to have the interlocutory decree revoked. Upon a hearing of this motion, at which evidence (including reports of the State Welfare Department) was in-, troduced, the court found no good cause for revoking the interlocutory decree. The natural father then appealed to this court.
 

 Pending the appeal here and the proceedings in the trial court more than two years have elapsed, and during that period much love and devotion undoubtedly have been kindled between the adoptive parents on the one hand and the child on the other, to say nothing of the time, energy and money that those parents have expended. It is inconceivable that the Legislature, in the enactment of the adoption law, could have contemplated a breaking of those bonds of affection as well as the
 
 *180
 
 wasting of the adoptive parents’ efforts, by reason of the unstable whims and fancies of the natural parent — by the mere changing of his mind.
 

 I respectfully dissent.